## ELECTION LAW

**VOTING SYSTEMS – STATUTORY CONSTRUCTION – STATUTE REQUIRING CERTIFICATION OF VOTING SYSTEMS DOES NOT APPLY TO ABSENTEE-BALLOT-MARKING WIZARD THAT IS NOT CONNECTED TO, OR A COMPONENT OF, THE VOTING SYSTEM**

August 23, 2012

*The Honorable Edward J. Kasemeyer*
*Maryland Senate*

The State Board of Elections ("SBE" or "State Board"), working under a U.S. Department of Defense grant, is developing a ballot-marking technology to be used with SBE's online ballot-delivery system for certain absentee voters. SBE proposes to make the technology available to military and overseas civilian voters who are covered by the Uniformed and Overseas Civilian Absentee Voting Act of 1986, 42 U.S.C. §§ 1973ff to 1973ff-6 ("UOCAVA"),[1] and who choose to receive their ballots by electronic transmission, as well as to domestic absentee voters with disabilities for whom the technology is needed to vote privately and independently. You have asked for our opinion on whether SBE may implement the ballot-marking technology without first certifying it under a State law requiring the certification of "voting systems." *See* Md. Code Ann., Election Law ("EL") § 9-102.

It is our opinion that the State Board may implement the ballot-marking wizard for military and overseas civilian voters without obtaining certification under § 9-102.[2] As explained

---

[1] UOCAVA applies to an "absent uniformed services voter" and to an "overseas voter." *See* 42 U.S.C. § 1973ff-6. In the first category are active duty members of a uniformed service or the merchant marine, or their spouses or dependents, who by reason of the member's duty are absent from the place of residence where the service member or spouse or dependent is otherwise qualified to vote. *Id.*, § 1973ff-6(1). The second category includes an "absent uniformed services voter" whose active duty takes the voter overseas, as well as certain U.S. citizens residing outside the United States. *Id.*, § 1973ff-6(5).

[2] Unless otherwise noted, all statutory references refer to the current version of the Election Law Article reflected in the 2010 Replacement Volume of the Annotated Code of Maryland and the 2011 Supplement and 2012 Cumulative Supplement.

below, the evaluation and certification process prescribed in § 9-102 expressly applies to a "voting system," which is defined by statute as "a method of casting and tabulating ballots or votes." EL § 1-101(xx); *see also* COMAR 33.09.01.01B(4)(a) (defining "voting system" as "all or any component of any system for casting and tabulating ballots or votes"). The proposed technology—commonly referred to as a ballot-marking "wizard"—allows voters to mark selections electronically on a downloadable ballot before it is printed, but it does not include a capability either to "cast" or "tabulate" votes. The ballot wizard, therefore, does not itself meet the definition of "voting system." Nor, in our opinion, does the ballot wizard modify a voting system such that certification would be required under § 9-102. Although the ballot-marking wizard performs a function that is part of the voting process for the absentee voters who opt to use it, it does not interface or interact with the State's certified optical-scan voting system. The statute does not unambiguously extend to stand-alone voting devices that, like the ballot-marking wizard, do not interact with the voting system that records and tabulates votes.

Maryland law does not require any specific evaluation process for a stand-alone device that is not part of the voting system. Certification under a voluntary federal program, which Maryland law has made mandatory for voting systems, is not available for an online ballot-marking tool regardless of whether it qualifies as a "voting system" under Maryland law. Accordingly, an interpretation of § 9-102 that would require certification of the ballot tool as a "voting system" is not a matter of more, versus less, testing, or of applying a higher performance standard in preference to a lower one. Instead, the real consequence of that interpretation would be to prohibit use of the ballot wizard altogether, regardless of its performance or potential benefit to overseas military and absentee voters.

Ballot-marking tools similar to that being developed by SBE will be available to absentee voters in other states and to Maryland military and overseas voters using the Federal Write-In Absentee Ballot. Because we do not see that Maryland law plainly requires a different result, we believe that a reviewing court would defer to the State Board's reasonable interpretation of the law and regulations it administers and uphold the SBE's decision that the ballot wizard may be used for overseas military and absentee voters without certification under § 9-102.[3]

---

[3] Our conclusion that certification of the proposed ballot wizard is not mandated by § 9-102 applies also to its proposed use to assist voters with disabilities to vote privately and independently. However, we note that, as to these voters, there may be other considerations unrelated either to the ballot-marking tool or State certification

(continued . . .)

# I

## Background

*Development of State Voting Systems Certification*

The State Board and its predecessor agency, the State Administrative Board of Election Laws ("SABEL"), have for more than 40 years regulated the specifics of Maryland's voting process. SABEL was created in 1969 at a time when mechanical-lever voting machines were required statewide for voting in polling places, *see* 1955 Md. Laws, ch. 701, with paper ballots allowed under certain conditions. *See*, *e.g.*, former Article 33, § 14-1 (1971 Repl. Vol.). Detailed statutes in the Maryland Code specified the capabilities and functionality that all voting machines were required to demonstrate, but State law included no provision for a central certifying authority or a program to evaluate specific types of voting machines. *See id.*, § 16-3.

SABEL was first given central certifying authority in 1975, when electronic voting system technology was introduced in Montgomery County in the form of electronically tabulated punch-card ballots. The county's acquisition of a punch-card system was made contingent on SABEL's approval of the "particular voting system," including "the form of ballot arrangement, the nature of the punch card used, the method of marking ballots, and any sorting or counting devices. . . ." 1975 Md. Laws, ch. 877, § 2 (codified at former Article 33, § 16A-1 (1976 Repl. Vol.)). Because a punch-card system does not operate in the same way as a mechanical lever system, many Code provisions regulating the lever machines were unsuited to the new system. For this reason, presumably, the General Assembly also directed SABEL to promulgate rules and regulations governing the use of the new punch-card system, including procedures for using the system in polling places on Election Day and canvassing votes following the election. *Id.*, § 16A-1(d).[4]

---

requirements that may limit the State Board's ability to offer the device to non-UOCAVA voters. Specifically, there is a question whether State law alone would authorize the electronic transmission of absentee ballots to non-UOCAVA voters, or whether other State or federal law relating to voters with disabilities would support that practice. These separate and very different issues are beyond the scope of your question regarding certification of the ballot wizard, and so we do not address them in this opinion.

[4] "'Canvass' means the entire process of vote tallying, vote tabulation, and vote verification or audit, culminating in the production and certification of the official election results." EL § 11-101(c)(1). In the context of absentee voting, "the 'canvass' includes the opening of

(continued . . .)

SABEL's role in approving new voting systems was expanded in 1978, when State certification became a precondition of the acquisition and use of new voting systems by all local boards of elections. 1978 Md. Laws, ch. 347. The same legislation included for the first time a definition of "voting system," which was defined as "a method of casting and tabulating ballots or votes." *Id*. (codified at former Article 33, § 1-1(a)(19) (1983 Repl. Vol.)). This definition has remained unchanged since 1978. *Compare id. with* EL § 1-101(xx).

The initial standards for voting system certification gave SABEL broad discretion to decide what kind of evaluation to conduct and what level of system performance to demand. For example, the 1978 statute required only that SABEL "assure that elections are conducted with equipment best designed to: (1) [p]rotect the secrecy of the ballot; (2) [p]rotect the security of the voting process; (3) [c]ount and record all votes accurately; and (4) [p]rotect all other rights of voters and candidates." Former Article 33, § 16B-2(a) (1983 Repl. Vol.). These basic standards have been retained in current law, though others have been added.[5]

In 1998, the General Assembly undertook a reorganization and revision of Article 33 in accordance with the recommendations of the Commission to Revise the Election Code. 1998 Md. Laws, ch. 585 (then codified at former Article 33, § 9-102(d) (1997 Repl. Vol., 1999 Supp.)). SABEL was replaced by the newly created State Board of Elections, which was given enhanced supervisory authority with respect to the local boards of election and "all persons involved in the elections process." *Id.*, § 2-102(a). Additionally, the State Board was charged with a duty to "maximize the use of technology in election administration, including the development of a plan for a

---

any envelope accompanying an absentee ballot and the assembly and review of absentee ballots in preparation for vote tallying." EL § 11-101(c)(2); *see also* COMAR 33.11.04 (absentee ballot canvass procedures), .05 (grounds for rejecting ballots).

[5] In addition to these general performance standards, the statute set forth a nonexclusive list of factors that SABEL was to consider in deciding whether to approve a particular system, including the commercial availability of the system and its components and replacement parts, the efficiency of the system, the likelihood of mechanical breakdown, its ease of understanding and convenience for the voter, the timeliness of its tabulation and reporting of election returns, the potential for verifying the vote count, and the cost of implementation. Former Article 33, § 16-B-2(b)(2) (1983 Repl. Vol.). These factors have been carried forward into current law, in substantially the same form, as "considerations" for certification. *See* EL § 9-102(e); *see also infra* note 10.

comprehensive computerized elections management system." *Id*., § 2-102(b)(7). The 1998 Act also added to the State's cert-ification program the requirement that voting systems be evaluated against voluntary federal standards.[6] *Id*., § 9-102(c)(2).

Although the 1998 Act enhanced the State Board's authority in some respects, it did not require the statewide use of a single voting system, with the result that, as of 2000, voters in Maryland were using at least four different technologies to record and tabulate their votes, as well as a number of different models for each type of voting system.[7] After the 2000 presidential election, and the problems revealed by the Florida recount and other voting system issues nationally,[8] Governor Glendening created a Special Committee on Voting Systems and Election Procedures to make recommendations on how to improve the voting systems technology used in Maryland. Executive Order 01.01.2000.25. Legislation enacted in the following session directed the State Board, in consultation with the local boards of election, to select a uniform statewide voting system for use in polling places and a system for use in canvassing absentee ballots. 2001 Md. Laws, ch. 564. The statute also added a requirement that the voting system be capable of creating a paper record of votes cast in the event of a recount and included provisions regarding the

---

[6] The Act included as a standard for certification that the voting system has been: "(i) [e]xamined by an independent testing laboratory that is approved by the National Association of State Election Directors; and (ii) [s]hown by the testing laboratory to meet the performance and test standards for electronic voting systems established by the Federal Election Commission. . . ." Former Article 33, § 9-102(c)(2)(i)-(ii) (1997 Repl. Vol., 1999 Supp.).

[7] For the 2000 presidential elections, four different types of voting systems and six different models were in use at polling places in Maryland. Montgomery County used a punch-card system; Baltimore City a direct-recording electronic system; Allegany, Dorchester, and Prince George's Counties mechanical lever machines; and, in nineteen counties, three different models of optical scan systems. *See*, *e.g*., Department of Legislative Services, Office of Policy Analysis, "Review of Election Administration in Maryland," at 25-26 (Nov. 2001). For absentee voters, Montgomery and Allegany Counties used a punch-card system; Dorchester County used paper ballots; and Baltimore City and the twenty remaining counties used one of six different models of optical scan systems, from three different vendors. *See* Special Committee on Voting Systems and Election Procedures in Maryland, "Report and Recommendations," at 110-11 (Feb. 2001).

[8] *See Bush v. Gore*, 531 U.S. 98, 104 (2000) ("This case has shown that punch card balloting machines can produce an unfortunate number of ballots which are not punched in a clean, complete way by the voter. After the current counting, it is likely legislative bodies nationwide will examine ways to improve the mechanisms and machinery for voting.").

allocation of costs to acquire and operate the voting system as between the counties and the State.  *Id.*  SBE implemented the statewide procurement in phases, beginning in 2001 with requests for proposals to supply four counties with a direct-recording electronic voting system for use in polling places and an optical-scan system for absentee voting.  By 2006, these two systems had been acquired and deployed statewide.

### *Maryland's Current Voting Systems Requirements*

The current version of § 9-101(b) of the Election Law Article requires that "[t]he State Board, in consultation with the local boards, shall select and certify a voting system for voting in polling places and a voting system for absentee voting."  The voting system now certified for absentee voting is the Model ES-2000 optical-scan system.  *See*, *e.g.*, COMAR 33.10.11 (voting system requirements and procedures for the Model ES-2000).  An optical-scan voting system like the ES-2000 is a paper-based voting system that "records votes, counts votes, and produces a tabulation of the vote count from votes cast on paper cards or sheets."  2005 Voluntary Voting System Guidelines, Vol. I, ¶ 1.5.2.1 (p. 10).[9]

Under § 9-102(c) of the Election Law Article, the State Board has a duty to "periodically review and evaluate alternative voting systems" for certification.  State Board regulations governing the State certification program provide, "[t]he vendor of a voting system may apply to the State Board for evaluation and certification of the system for use in the State."  COMAR 33.09.03.02A.  The vendor is required to identify the voting system by "specify[ing] clearly the specific equipment, hardware, firmware, and software for which certification is sought."  *Id.*, 33.09.03.02B(1).

---

[9] The 2005 Voluntary Voting System Guidelines are a set of federally developed "specifications and requirements against which voting systems can be tested to determine if the systems provide all of the basic functionality, accessibility and security capabilities required of these systems."  Election Assistance Commission, "Voluntary Voting System Guidelines," *available at* http://www.eac.gov/testing_ and_certification/voluntary_voting_system_guidelines.aspx (last visited Aug. 16, 2012).  The 2005 guidelines are the third iteration of voluntary federal standards and were developed by the Election Assistance Commission pursuant to the Help America Vote Act.  *Id.*  The 2005 guidelines include accessibility standards, which the General Assembly has adopted under certain circumstances.  *See*, *e.g.*, EL § 9-102(f)(3) and (h)(1).  Previous versions of the voluntary federal standards were developed by the Federal Election Commission and issued as "voting system standards" in 1990 and 2002.

Section 9-102(d) sets out the standards that the State Board must apply when reviewing a voting system for certification:

> The State Board may not certify a voting system unless the State Board determines that:
>
> (1) the voting system will:
>
>> (i) protect the secrecy of the ballot;
>>
>> (ii) protect the security of the voting process;
>>
>> (iii) count and record all votes accurately;
>>
>> (iv) accommodate any ballot used under this article;
>>
>> (v) protect all other rights of voters and candidates;
>>
>> (vi) be capable of creating a paper record of all votes cast in order that an audit trail is available in the event of a recount, including a manual recount; and
>>
>> (vii) provide a voter-verifiable paper record . . . ;
>
> (2) the voting system has been:
>
>> (i) examined by an independent testing laboratory that is approved by the U.S. Election Assistance Commission; and
>>
>> (ii) shown by the testing laboratory to meet the performance and test standards for electronic voting systems established by the Federal Election Commission or the U.S. Election Assistance Commission; and
>
> (3) the public interest will be served by the certification of the voting system.

EL § 9-102(d).[10] Additionally, the statute requires SBE to evaluate a voting system for compliance with the requirements of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 to

---

[10] In addition to these performance or system-capability standards, the statute also directs the State Board to consider other factors in making its certification decision, including the commercial availability of the system, cost of implementation, likelihood of malfunction, efficiency of the system, convenience and ease of understanding for the voter, timeliness of tabulating and reporting of election returns, the accessibility of the system for voters with disabilities, and "any other factor that the State Board considers relevant." EL § 9-102(e).

12213, and the Help America Vote Act, 42 U.S.C. §§ 15301 to 15545. *See* EL § 9-102(f) through (h). In general, the standards contained in § 9-102 allow SBE considerable discretion to decide what sort of evaluation is appropriate and what level of performance will be deemed acceptable. The notable exception is the requirement in subsection (d)(2), which makes conformance testing by an accredited laboratory to federal voting system standards a necessary precondition to State certification.

### *Provisions of Federal Law Relating to Voting Systems*

The Help America Vote Act of 2002 ("HAVA") was the federal response to the widespread dissatisfaction with voting system performance in the 2000 presidential elections. That legislation required states to upgrade their voting systems to meet certain minimum requirements, provided federal grants for that purpose, and created the U.S. Election Assistance Commission ("EAC") to administer the grant program and to provide technical guidance to help states comply with the Act. The federal minimum standards imposed by HAVA apply to all voting systems used in federal elections. These standards include certain requirements regarding "overvotes,"[11] auditing of election results, and accessibility for persons with disabilities. *See* 42 U.S.C. § 15481(a).

HAVA defines a "voting system" to mean:

> (1) the total combination of mechanical, electromechanical, or electronic equipment (including the software, firmware, and documentation required to program, control, and support the equipment) that is used—
>
> > (A) to define ballots;
> >
> > (B) to cast and count votes;
> >
> > (C) to report or display election results; and

---

[11] An "overvote" occurs when one votes for more than the maximum number of selections allowed in a contest. A HAVA-compliant voting system that is used in polling places must notify voters of overvotes and the consequences of overvoting and afford voters the opportunity to correct overvotes and verify or change their selections before the ballot is cast. 42 U.S.C. § 15481(a)(1)(A). An exception is made for paper ballot voting systems, punch card voting systems, or central count voting systems—including a central count system for mail-in absentee ballots—which may meet the foregoing requirements by establishing a voter education program about the effect of overvoting and giving instructions on how to correct errors with a replacement ballot. 42 U.S.C. § 15481(a)(1)(B)(i)-(ii).

> > (D) to maintain and produce any audit trail information; and

> (2) the practices and associated documentation used—

> > (A) to identify system components and versions of such components;

> > (B) to test the system during its development and maintenance;

> > (C) to maintain records of system errors and defects;

> > (D) to determine specific system changes to be made to a system after the initial qualification of the system; and

> > (E) to make available any materials to the voter (such as notices, instructions, forms, or paper ballots).

42 U.S.C. § 15481(b). HAVA's broad definition of a voting system is directly relevant to voting systems in all states for purposes of state compliance with its requirements as to overvotes, auditing capability, and accessibility standards. However, the statute does not impose testing or certification requirements on any state, even for the limited purpose of determining whether a state's voting system is HAVA-compliant.[12]

Section 202 of HAVA directs the EAC to adopt voluntary voting system guidelines and to provide for the testing and certification of voting system hardware and software. 42 U.S.C. § 15371(a). The guidelines provide a baseline against which voting systems can be tested. *See supra*, n.9. EAC certification, in turn, gives an assurance that a voting system, if deployed and operated correctly, will perform to this standard. However, conformance

---

[12] Because the EAC certification program uses the HAVA definition of "voting system," *see* 2005 Voluntary Voting System Guidelines, Vol. I, p. A-19, that definition also serves to identify what functions should be reviewable under the voluntary federal certification program. However, apart from the capability to "cast and count votes," none of the other functions in the HAVA definition is expressly referenced in Maryland's definition, though some of them (such as reporting of election results and creation of an audit trail) are included by implication insofar as no system can be certified by the State Board without these capabilities. *See* EL § 9-102.

testing under the EAC program is purely voluntary for the states, as is the selection of which voting system guidelines, if any, a state's voting system should meet. Neither HAVA nor any other federal law mandates the testing or certification of voting systems.

The EAC certification program is limited in other respects as well. Most importantly for our purposes, EAC certification is not available for individual components of a voting system. Rather, the manufacturer submits an entire voting *system* for certification and identifies the various specific configurations of system components that it wishes to certify. *See*, *e.g.*, EAC, "Voting System Testing and Certification Program Manual," v.1.0, at 18 (eff. June 1, 2011) ("An EAC certification is an official recognition that a voting system (in a specific configuration or configurations) has been tested to and has met an identified set of Federal voting standards."). Although federal voting system guidelines do include testing standards for different parts or subsystems of a voting system and for testing interfaces between components, the certification attests only to the overall performance of the specific configuration or configurations that the manufacturer submits. *See*, *e.g.*, 2005 Voluntary Voting System Guidelines, Vol. I, at 7 ("The certification number applies to the system as a whole and does not apply to individual system components or untested configurations."). And because the EAC only certifies voting *systems*, it is effectively limited to private manufacturers, inasmuch as governments typically do not design and manufacture entire voting systems.

### *Military and Overseas Absentee Voters*

Federal law mandates certain actions by the states to facilitate absentee voting opportunities for military personnel and overseas civilian voters. In 2009, Congress passed the Military and Overseas Voter Empowerment ("MOVE") Act, which amended UOCAVA to require, among other things, that states provide a method for transmitting blank absentee ballots to UOCAVA voters electronically and by mail for any election for federal office, 42 U.S.C. § 1973ff-1(a)(7), and allow those voters to designate which transmission method they would prefer. *Id.*, § 1973ff-1(f)(1). "To the extent practicable," each state must ensure that its transmission procedures "protect the security and integrity of absentee ballots" and that "the privacy of the identity and other personal data [of the voter] is protected throughout the process of such transmission." *Id.*, § 1973ff-1(f)(3).

Consistent with this federal mandate, Maryland offers electronic transmission of blank ballots to UOCAVA voters via an online absentee-ballot-delivery system. For the 2012 general election, a UOCAVA voter requesting electronic delivery will be notified by e-mail that his or her absentee ballot is ready and will

be provided a link and ballot-tracking number that gives access to the system. *See*, *e.g.*, Letter of Linda Lamone, Administrator, SBE, to Sen. Brian Frosh, at 2-3 (Feb. 6, 2012). From the SBE website, using the ballot-tracking number and other required information, the voter will be able to download and print a blank ballot, ballot instructions, a form containing the ballot oath, a return envelope, and other voting materials. *Id.* The completed ballot, together with the signed ballot oath, must be returned by regular mail (or by an authorized agent) to the appropriate local board of elections for review, inspection, and tabulation during the absentee ballot canvass. *See generally* COMAR 33.11.04.

A paper ballot that is printed and returned by the absentee voter cannot be read by the optical-scan voting system, which requires heavier paper and printed "timing marks" to allow the scanner to read and record the voter's selections. As a result, a bipartisan duplication team must copy, by hand, the voting selections marked on the paper ballot onto a scan-ready ballot card. *See* COMAR 33.11.04.08; *see also* EL § 9-303(b)(8) (requiring guidelines on absentee voting to include "review of voted ballots and envelopes for compliance with the law and for machine tabulation acceptability"). This "duplicate" ballot is then fed into the optical scanner where the votes are recorded and tabulated.

### *The Proposed Ballot-Marking Wizard*

The ballot-marking wizard at issue here is being developed for the Federal Voting Assistance Program ("FVAP"), a unit within the Department of Defense that was established to assist uniformed services personnel and overseas civilians in exercising their right to vote in federal elections. *See generally* R. Michael Alvarez, *et al.*, "Military Voting and the Law: Procedural and Technological Solutions to the Ballot Transit Problem," 34 Fordham Urb. L.J. 935 (April, 2007). The FVAP solicited grant proposals under 10 U.S.C. § 2358 to develop and implement technologies to make voting more accessible for UOCAVA voters. *See* 10 U.S.C. § 2358(a)(2)(B) (authorizing the Secretary of Defense to engage in research and development projects of "potential interest to the Department of Defense"). In 2011, SBE applied for and received a grant of $653,719 to develop an online voter-registration system for use by UOCAVA voters and to make certain enhancements to the State's online ballot-delivery system, including the development of a ballot-marking wizard. *See* "DoD Awards Grants for State & Local Military/Overseas Voting Systems" (Nov. 3, 2011), *available at* http://www.fvap.gov/ global/news/2011news/nr29-2011.html (last visited Aug. 14, 2012); *see also* Maryland State Board of Elections, Technical Proposal, "Online Voter Registration & Ballot Marking and Counting: An Adaptable and Open Source Solution" ("Grant

Proposal'), at 3, *available at* http://www.fvap.gov/resources/ media/maryland.pdf (last visited Aug. 21, 2012).

Under the current process, absentee voters receive their ballots by mail, fill them out by hand, and return them by mail. As described in SBE's Grant Proposal, the ballot wizard would give military and overseas civilian voters the option to download the ballot from the SBA's website, make voting selections on the voter's computer, review a summary screen showing those selections, and print out a ballot with the selections marked. Grant Proposal at 7. The wizard would notify the voter of any overvote or undervote and give her the opportunity to correct her ballot accordingly. *Id.* The wizard would also generate and print onto the ballot a barcode encapsulating the voter's selections. *Id.* at 8-9. After the voter returns her completed ballot, canvassers scan the barcode to generate a duplicate ballot, as opposed to duplicating the ballot by hand, as is the current practice. *Id.* at 7-9. The Grant Proposal explains the expected benefits of the ballot wizard and barcode:

> This wizard will improve the accuracy and readability of the voter's voted ballot as it will be designed to prevent overvotes and other voter errors, decrease the likelihood that an election official has to determine the intent of the voter, and increase voter satisfaction with the voting process. These benefits will lead to increased ballot return and acceptance rates.
>
>            *     *     *
>
> [The barcode] has two significant benefits over the current process of manually duplicating ballots. First, it serves an important safeguard during the canvassing process and improves the accuracy of the counting process by reducing the risk of transcription error when manually duplicating a ballot. It also improves the efficiency of the canvasses conducted by local election officials by replacing a manual process with a primarily automated process with a manual verification.

Grant Proposal at 7, 8-9. A further goal of the proposal was to create a "generic, system neutral interface" that could be easily adapted to different voting or election systems and easily shared with other jurisdictions. *Id.* at 4.

## II

## Analysis

Whether the certification requirements of § 9-102 of the Election Law Article extend to the State Board's proposed use of a ballot-marking wizard is, at its heart, an issue of statutory construction. In construing a statute, the "cardinal rule" is to ascertain and give effect to the actual intent of the Legislature. *Gardner v. State*, 420 Md. 1, 8 (2011). The starting point in this analysis is to consider the ordinary, plain meaning of the statutory language. *Id.* If this language is unambiguous and consistent with the apparent purpose of the statutory scheme, the inquiry into legislative intent is normally at an end. *Id.* at 8-9. A court interpreting a statute will "neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute" and will not "construe a statute with forced or subtle interpretations that limit or extend its application." *Id.* (internal quotation marks omitted).

According to its plain language, § 9-102 applies to a voting system, the characteristics and overall performance of which must, for certification, meet certain statutory criteria. "Voting system" is elsewhere defined as "a method of casting and tabulating ballots or votes." EL § 1-101(xx). We believe the General Assembly, by its use of the term "method," meant to cover any technological approach to the job of "casting and tabulating" votes, whether it be based on punch-cards, optical-scans, or any other type of platform that would later be developed. This reading is confirmed by the historical development of the State certification program, where State-level certification began as a legislative response to the problem of managing the use in different counties of new and various voting system technologies in place of the comparative uniformity that had existed previously, when all counties used mechanical-lever systems in accordance with the rules set out in the Maryland Code.

Given this apparent purpose to include the complete array of developing technologies, it is unremarkable that neither the definition of "voting system," nor the certification statute itself, undertakes to list the particular functions or components that must be included in a voting system. The multiplicity of voting systems in place at the time would have made it exceedingly difficult to identify which components are necessarily embraced by the term "voting system." Instead, the State definition identifies a voting system only with regard to the core functions that would be expected of any technology used to conduct an election: the casting and tabulating of votes.

In practice, the specification of which components are considered part of the voting system is a responsibility of the manufacturer that requests State or EAC certification because

certification attaches only to the particular configuration of hardware and software that the manufacturer or vendor submits for testing.  *See*, *e.g.*, COMAR 33.09.03.02 (vendor's application must specify the equipment, software, and firmware for which certification is sought).  No form of certification is available for an isolated, stand-alone device that is something less than a voting system.  In addition, a separable system component does not receive any approval for use except in the precise configuration of an entire system in which it has been tested.  Any device or component, if removed from the tested configuration, is not "certified."  In short, the only type of certification available under § 9-102 is for the entire voting system operating *as a system*.

The legislative intent to create an evaluation process reserved for complete voting systems is reflected in the capabilities, performance standards, and other considerations contained in the statute, which are all exclusively system-level requirements.  *See* EL § 9-102(d).  The performance of individual components or subsystems is not even addressed by § 9-102.  Accordingly, we can discern in § 9-102 no intent to require certification for any particular device—including a ballot-marking device—except insofar as the device may itself qualify as a voting system or be used as a component in a voting system.[13]  Consistent with this understanding of the basic scope of § 9-102, we consider each of these possibilities in turn.

## A.    *The Ballot-Marking Wizard is Not a Voting System*

The ballot-marking wizard does not in our view perform either of the core functions of a voting system under Maryland law:  the "casting or tabulating" of votes.  "Cast," in the voting sense, means "[t]o formally deposit (a ballot) or signal one's choice (in a vote)," Black's Law Dictionary 246 (9th ed. 2009), or "to deposit (a ballot) formally or officially[.]"  *Hawaii State AFL-CIO v. Yoshina*, 935 P.2d 89, 92 (S. Ct. Haw. 1997) (quoting Webster's New Int'l Dictionary (2d ed. 1959)).  Even in its more common meaning, the word "cast" connotes motion.  Merriam Webster's Collegiate Dictionary (10th ed. 1993) ("to cause to move or send forth by throwing").    Although dictionary

---

[13] Federal law reflects a similar understanding that the word "system" implies some level of integration or common operation.  For example, the 2005 federal guidelines define an "electronic voting system" to be "one or more *integrated* devices that utilize an electronic component for one or more of the following functions: ballot presentation, vote capture, vote recording, and tabulation. . . ." Voluntary Voting System Guidelines, Appendix A: Glossary, at A-10 (defining "electronic voting system," (emphasis added)), *available at* http://www.nist.gov/itl/vote/upload/VVSG-Volume-IAppendixA.pdf (last visited Aug. 16, 2012).

definitions do not resolve the interpretive issue before us, we believe that, on balance, they marginally favor a reading of "casting" that is focused on the process of *submitting* the ballot or vote for recordation and not the process of *marking* the ballot.

In some contexts, the difference between marking selections on a ballot and casting a ballot is clearly delineated. HAVA, for example, requires that voters be afforded an opportunity to "verify . . . the votes selected" and correct any errors *before* the ballot is "cast and counted." 42 U.S.C. § 15481(a)(1)(A)(i); *see also* 2005 Voluntary Voting System Guidelines at A-19 (defining "voted ballot" as a "[b]allot that contains all of a voter's selections and has been cast"). In the context of absentee voting, courts have even more clearly delineated the distinction between marking one's selections on a ballot and "casting" a ballot or vote. *See*, *e.g.*, *Maddox v. Board of State Canvassers* 149 P.2d 112, 115 (Mont. 1944) (observing that under Montana election law "[n]othing short of the delivery of the ballot to the election officials for deposit in the ballot box constitutes casting the ballot" and "[i]t is not the marking but the depositing of the ballot in the custody of the election officials which constitutes casting the ballot or vote"); *see also Wakulla County Absentee Voter Intervenors v. Flack*, 419 So.2d 1124, 1126 (Fla. App. 1982) (noting that all absentee votes were "cast" in the election supervisor's office for purposes of statute allowing absentees to request assistance).

The term "casting" is also frequently used to encompass both the marking *and* the depositing of the ballot, as when, for example, a voter's right to privately cast a ballot is invoked. *See*, *e.g.*, EL § 9-102(f)(2) (voting system shall ensure private casting of votes by persons with disabilities); *see also State ex rel. Stokes v. Brunner*, 898 N.E. 2d 23, 28 (Ohio 2008) (noting that "electors who deposit their absentee ballots at a polling location during the absentee-voting period have cast their ballots under the plain language of [the Ohio observer statute] by marking them and formally depositing them"). But while "casting" is sometimes shorthand for both actions together, marking a ballot without officially submitting it for counting does not, by itself, amount to "casting" a ballot or vote. Marking is precisely what the proposed ballot wizard does, and no more.

The difference between the vote recording and tabulating that a voting system performs and the ballot marking that a UOCAVA voter performs through the use of the wizard is not merely linguistic; marking selections on an absentee ballot and officially recording one's vote are distinct processes. The proposed ballot wizard lacks any capability for sending, receiving, or officially recording voted ballots. Nor does the online ballot-delivery system enable voters to submit their ballots electronically for direct tabulation by another device or system. A

technology that included either of these two abilities might well bridge the gap between the two processes and thereby constitute a method for casting a ballot or vote. But the ballot wizard does neither. Voters using the online wizard can only cast their ballots in the same way that all other absentee voters do, by mailing the ballot to the appropriate local election board.

The fact that the ballot wizard generates a barcode that captures the voter's selections does not alter our conclusion. The sole purpose of the barcode is to ease the process of ballot duplication that occurs during the canvassing process. Instead of the current system of hand-marking the absentee's selections onto the ballot card so that it can be fed into the optical-scan system, election workers handling a paper ballot marked with the wizard will scan the barcode to automatically generate the duplicate ballot card. But using either method to mark the downloaded ballot, the duplicate card is checked against the visible marks the voter made on the paper ballot, which remains the official record of his or her vote. If the ballot generated from the barcode does not match the visible record the voter has marked on the original paper she has submitted—where, for example, a voter using the ballot wizard later uses a pen to change her selection after printing the ballot—the visible record is used to create the duplicate and the barcode is disregarded. In this respect, the barcode is but a scrivener's tool, an administrative convenience for streamlining and regularizing the intermediate process of copying the absentee voter's choices into a system-readable format. At no point does the use of the barcode affect either the voter's selections or the voting system itself.

The conclusion that a ballot wizard is not a "voting system" is generally consistent with the way others, including the EAC, regard the technology. In response to a question from the State Administrator of Elections on how the EAC would view ballot-marking wizards for certification purposes, the EAC's Testing Director wrote: "Web applications, such as on-line ballot marking wizards, do not meet the definition of a voting system as defined in the V[oluntary] V[oting] S[ystem] G[uidelines] and therefore are not considered eligible for testing and certification under the EAC program." Memorandum of Brian Hancock, Director, EAC Testing and Certification Division, to Linda Lamone, Administrator, SBE, at 2 (Feb. 3, 2012).[14]

_____

[14] The memorandum noted that the EAC General Counsel "concurs with the substance" of the memorandum, although "it does not constitute an official opinion of the EAC because of the current lack of a quorum of Commissioners." Memorandum of Brian Hancock, Director, EAC Testing and Certification Division, to Linda Lamone, Administrator, SBE, at 1.

We are aware that California's Secretary of State, interpreting California law, came to the opposite conclusion when she determined that a technology similar to SBE's ballot wizard *did* amount to a voting system. The California Secretary of State explained that "LiveBallot enables voters to use a computer to 'mark[] their ballot selections online' and thus to cast votes." Letter of Debra Bowen, Secretary of State, California, to Bryan Finney, President, Democracy Live at 2 (October 11, 2011).

The differences between California election law and Maryland law may account for the different interpretations. Putting aside whether the ballot wizard "casts" ballots, it clearly does not "tabulat[e]" them, something Maryland's definition of "voting system" requires that California's does not. *Compare* EL § 1-101(xx) ("a method of casting *and* tabulating ballots or votes" (emphasis added)), *with* Cal. Elec. Code § 362 ("any mechanical, electromechanical, or electronic system and its software, or any combination of these used to cast *or* tabulate votes, or both" (emphasis added)). We also note that California's certification program operates in an elections environment that is very different from Maryland's. In California, every county may choose its own voting system whereas, in Maryland, the State Board selects a single statewide system that must be used "in all counties." EL § 9-101(c); *see generally* Letter of Debra Bowen, Secretary of State, California, to Bryan Finney, President, Democracy Live. Given the far greater possibility for variation in voting systems across California, it should not be surprising that election authorities there might interpret their voting system statutes more broadly in an effort to maintain some uniformity in the standards that apply to those disparate systems.

Whatever the merits of the Secretary of State's reading of the California statute, legislation has been introduced to clarify the difference between a "ballot marking system" and a "voting system," and to specify that the term "voting system" does not include the type of ballot-delivery and ballot-marking system proposed by the State Board here. *See* California Assembly Bill 1929, Third Reading (as amended June 28, 2012), *available at* http://www.leginfo.ca.gov/pub/11-12/bill/asm/ab_1901-1950/ab_1929_bill_20120628_amended_sen_v95.pdf (last visited Aug. 21, 2012)). The bill defines a "ballot marking system" to mean "any mechanical, electromechanical, or electronic system and its software that is used for the sole purpose of marking a ballot for a special absentee voter and is *not connected to a voting system at any time*." *Id.* (emphasis added). The legislation prohibits a ballot-marking system from including certain capabilities (*e.g.*, the ability to store voting selections or tabulate votes) and requires the Secretary of State to establish new procedures for the review and approval of such systems. *See* California Assembly

Bill 1929, Third Reading, § 5 (proposing to amend the California Elections Code by adding §§ 19260 to 19275).[15]

A number of other jurisdictions already appear to offer ballot-marking tools to assist UOCAVA voters in completing electronically-delivered ballots. *See* FVAP, "Electronic Voting Systems Fact Sheet," *available at* http://www.fvap.gov/resources/media/evswfactsheet.pdf (last visited Aug. 22, 2012). Among the states to offer ballot-marking tools are those, like Delaware, that have voting system certification requirements analogous to Maryland's, including that a voting system used in the State must have received federal certification. *See*, *e.g*., Del. Code Ann., title 15, § 5001(d) (requiring certification to voluntary voting system standards for "any voting device, machine or system purchased by the State"). However, the significant differences among state voting-system laws and election-administration schemes make comparisons difficult and of relatively limited help in our analysis. Still, it seems fair to conclude that some other states have, at a minimum, viewed online absentee ballot systems as something other than a voting system. *See* "Written testimony in support of SB 1078" by Bob Carey, Director, Federal Voting Assistance Program, U.S. Department of Defense, at 5 (April, 2012) ("Requiring pre-certification of such an online blank ballot delivery and online marking system would make Maryland the only one of the 24 states with similar tools with such a requirement; to date, no other State has required their system pass pre-certification requirements."). That appears to be the effect of the proposed legislation in California. We think the same conclusion follows from a comparison of the ballot wizard against Maryland's definition of a "voting system."

### B.    *The Ballot Marking Wizard Does Not Modify the ES-2000 Voting System*

For similar reasons, we conclude that the ballot wizard does not modify Maryland's voting system such that its use would trigger the certification requirement. Maryland voters use one of two certified voting systems—a touchscreen system for voting in polling places and an optical-scan system for absentee and

---

[15] As of August 21, 2012, AB 1929 had been ordered to a third reading in the California Senate. Like the pending California measure, Maryland legislation proposed during the 2012 General Assembly session would have expressly authorized the development of an on-line ballot-marking tool and the fax or internet transmission of ballots for military or overseas voters and voters with disabilities who request such delivery. *See* S.B. 1078, 2012 Gen. Assembly (third reader) (proposing to amend EL §§ 9-306(b), 9-308(c)). The Maryland bill passed third reader in the Senate but did not reach third reader in the House of Delegates before the end of the legislative session.

provisional voting. *See*, *e.g.*, State Board of Elections, "Overview of Maryland's Voting System," *available at* http://www.elections. state.md.us/voting_system/index.html (last visited August 21, 2012). When used for absentee voting, the ES-2000 optical-scan system functions as a central-count system, meaning that all votes are recorded and tabulated in a central location during the absentee ballot canvass. Canvass procedures control the handling of returned ballots, COMAR 33.11.04, and determinations about whether the ballots are accepted or rejected, COMAR 33.11.05. To record and tabulate votes, election officials manually feed ballot cards into the AccuVote unit, the scanning apparatus that records and counts votes and tabulates the results. COMAR 33.10.11.01B. Thus, apart from the unit's programming, the ballot card is the only real input into the optical-scan unit.

From the State Board's description of its proposed use, the ballot wizard would never be connected to the ES-2000 system and would not interface at any point with the optical-scan unit. The configuration of the ES-2000 system would remain unchanged by the manner in which the absentee voter chooses to indicate his or her vote, whether it be by pen, pdf annotator,[16] or the ballot wizard at issue here. *See*, *e.g.*, COMAR 33.11.05.05A(1) ("Absentee ballots may be marked by any kind of pencil or ink."). The paper ballot that is created from the ballot wizard is never introduced into the optical-scan system, but is instead separated from the vote-recording and tabulation processes by intermediate procedures needed to duplicate the voter's original ballot onto a ballot card capable of being scanned. Consequently, we can foresee no realistic scenarios in which the ballot wizard itself could affect the performance of the optical-scan system.[17] For these reasons, we do not think that use of the ballot wizard would represent a modification or addition to the ES-2000 absentee system.

---

[16] A pdf annotator is a type of commercially available software that enables the user to electronically mark documents provided in the commonly used portable document format, or "pdf," using either a touchscreen or keyboard.

[17] Commenters expressed concern about the security of the ballot wizard and the possibility that malware or other computer viruses present on the absentee voter's computer might cause the wizard to misidentify the voter's selections. It is our understanding that the State Board is aware of these concerns and is testing the wizard accordingly. Although the hypothetical possibility of technical malfunction may not be irrelevant to the interpretive decision we address here, it is an aspect of that decision that is properly left to the agency to evaluate. *See Schade v. Maryland State Bd. of Elections*, 401 Md. 1, 39 (2007) (observing that it is for the State Board, and not a reviewing court, to evaluate the need for security measures).

This is not to say that a ballot-marking wizard is never part of a voting system; it commonly is. In fact, in 2009, the State Board required certification of the polling-place use of a ballot-marking device in conjunction with the optical-scan system. At that time, State law required SBE to acquire a new polling-place system that provided a voter-verifiable paper record and met the relevant HAVA accessibility standards. 2007 Md. Laws, chs. 547, 548. If no system meeting both requirements were commercially available, a statutory contingency plan allowed for an alternative procurement. 2009 Md. Laws, ch. 428. Optical-scan systems without a ballot-marking device to assist voters with disabilities did not meet the accessibility standards. And though accessible ballot-marking devices had been developed, no optical-scan system had been certified to the Voluntary Voting System Guidelines with the ballot-marking device included as a component of the system. The question arose, therefore, whether the contingency had been met or whether the optical-scan system and the marking device together were a "commercially available" voting system, despite the lack of federal certification for that configuration of system components. *See generally* SBE Memorandum to Offerors, "Determination of Commercial Availability & Cancellation of Solicitation #D38B9200010 (May 11, 2009).

With advice from this Office, SBE concluded that certification of the ballot-marking device was required under § 9-102 and therefore no qualifying system was available. *Id.* In that situation, the ballot-marking device had to be regarded as part of the voting system for both legal and technical reasons. As a strictly legal matter, State law required a voting system that met accessibility standards. EL § 9-102(f), (g). Therefore, if the ballot-marking device was necessary for the system to meet those standards, the ballot-marking device had to be considered as part of the system for certification purposes. Moreover, from a more technical perspective, the proposed use of the ballot-marking device in polling places made it part of the voting system. Though not physically connected to the optical-scan unit, the device would mark the actual ballot cards fed into the scanning device. Accordingly, the ballot-marking device interacted with the optical-scan system to this extent and its performance and accuracy, and the quality of the marks on the ballot card would directly impact the performance of the optical-scan system.

By contrast, the ballot-marking wizard does not itself mark selections on the ballot card—the casting mechanism used by the ES-2000 system—and so does not have the same potential to modify or affect the performance of that system. Morever, an absentee voter who has used a wizard to assist her in navigating through the various ballot choices before printing her ballot has the opportunity to review the accuracy of the marked selections at her leisure and to make any corrections she finds necessary.

These important differences, in terms of system performance and accuracy, illustrate the principle that a ballot-marking tool may be considered part of a voting system if it is integrated into or connected with that system. *See*, *e.g.*, COMAR 33.09.01.01B(4)(b)(ii) (defining "voting system" to include a "voting machine, voting device, tabulating equipment, vote-counting program, or other equipment, hardware, firmware, or software used *by or with* a voting system" (emphasis added)). Arguably, the need for testing and certification as to these core functions would arise where the ballot-marking tool is integrated into the voting system because, once the ballot is cast in such an arrangement, the voter is completely reliant upon the voting system to record and tabulate all votes accurately. Because the State Board has determined that the ballot-marking wizard before us now is not so integrated, and the facts support its determination, we conclude that certification is not required.

### C.   *SBE's Interpretation of the Statute is Reasonable*

Although the State Board has interpreted § 9-102 to apply to a ballot-marking device when that device is a component of a complete voting system, it views the proposed ballot-marking wizard as separate from, and thus not a part or component of, the certified optical-scan system. *See generally*, Letter of Linda Lamone, Administrator, SBE, to Sen. Brian Frosh (Feb. 6, 2012). Certainly, other readings are possible; the statute offers no clear rule on how to define the limits of a system, except to the extent the vendor has already done so. However, given the statutory purpose of assuring the "security and integrity" of the various voting processes, EL § 1-201(6), the question of how to define those limits becomes more technical than legal, requiring the exercise of expertise about voting systems, their components, and how they interact with one another. As the agency that has since 1978 exercised all of the statutory duties relating to State certification of voting systems, the State Board is well suited to define what is, and is not, a "voting system" and we believe that a reviewing court would afford SBE's interpretation of "voting system" considerable deference.

"'[A]n administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight. . . .'" *Thanner Enterprises, LLC v. Baltimore County*, 414 Md. 265, 275 (2010) (quoting *Maryland Aviation Administration v. Noland*, 386 Md. 556, 572 (2005)). The deference ordinarily due to an agency's interpretation of the statute it administers "is all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quoting

*Pauley v. BethEnergy Mines*, *Inc.*, 501 U.S. 680, 697 (1991)); *see also Thanner*, 414 Md. at 275 (observing that "'the expertise of the agency in its own field should be respected'") (quoting *Noland*, 386 Md. at 572).

The conclusion that the State Board's application of the certification provisions is entitled to deference finds support in *Schade v. Maryland State Bd. of Elections*. There, the Court of Appeals concluded that SBE's certification of a voting system was entitled to deference because the certification decision was "a matter of policy or quasi-legislative in nature," and because "the statutory requirements . . . give the State Board broad discretion to weigh various factors and ultimately decide on a system. . . ." 401 Md. at 38-39. Within the context of the certification of voting systems, the Court stated, the State Board was "no doubt, in a better position to carry out the charge delegated to it than any other entity, including this Court." *Id*. at 39.

In our view, a reviewing court would likely afford the State Board's determination here—that a ballot-marking wizard neither *is* a voting system nor *modifies* a voting system—the same deference that it afforded the certification decision in *Schade*. In addition to the "broad discretion" described in *Schade*, the Legislature delegated to the State Board the interpretive responsibility to promulgate regulations construing the certification process and its applicability to voting systems. *See* EL § 9-102(b). We believe it incontrovertible that the State Board, and not a reviewing court, is best equipped to make the fine technical determinations as to what types of voting-related devices have a sufficiently close connection to the voting system to be subject to certification as a part thereof. Thus, just as in *Schade* the Court of Appeals observed that "it is not this Court that should ultimately decide on the State's voting system, but the State Board, to which that power was expressly delegated," 401 Md. at 39, we believe that the technical decision at issue here is also one that the Legislature has delegated to SBE, and SBE's decision is therefore entitled to deference. *See* 76 *Opinions of the Attorney General* 3, 14 (1991) (agency "has presumed expertise and . . . responsibility" to determine specific application of statutory term, the scope of which was not clearly delineated by the General Assembly); 78 *Opinions of the Attorney General* 26, 32 (1993) (same).

Several commenters have expressed their disagreement with the State Board's understanding of § 9-102. In their view, when technology is used to mark ballots, it is so intertwined with the voting process that it necessarily becomes a part of the voting system. In addition, they note that the wizard performs functions that fall within the HAVA definition of "voting system" and also that there are federal guidelines that address ballot marking. Finally, they express a concern that if § 9-102 is not construed to

require certification, the protection it offers to voters would be undermined.

Although we see merit in these arguments, ultimately we find that these views are not anchored in the text or design of the statute. As explained above, the State definition of "voting system" does not plainly encompass a stand-alone ballot-marking tool. Instead, that definition focuses on "casting and tabulating ballots or votes," EL § 1-101(xx), which is something the ballot-marking wizard does not do. Furthermore, the text of § 9-102 itself does not address the question of how the State Board should evaluate any particular voting-related device, except in the context of a complete voting system. The absence from § 9-102 of any provision for testing separate devices suggests that this is a case the Legislature has simply not provided for, rather than an intent to apply the statute as broadly as possible.

Nor is it warranted, in our opinion, to interpret § 9-102 in light of the federal definition of "voting system." The State definition preceded the enactment of HAVA and has not been changed subsequently to conform to the federal definition. The two definitions are also textually very different, with the State definition encompassing only the two core functions of a voting system—"casting and tabulating" votes—and the federal definition including within its reach a number of specific aspects of voting. The two definitions also operate very differently in this context; § 9-102 imposes certification testing for devices covered by the term "voting system," whereas HAVA imposes no certification process whatsoever and fairly minimal performance requirements. Thus, using the broadest possible definition of "voting system" for purposes of HAVA would pose little risk of circumscribing State authority with respect to its own systems, whereas using the same definition for § 9-102 might seriously impede SBE's ability to manage election-related technology. In sum, we would hesitate to regard the federal definition as a gloss on the State definition.

A further problem with interpreting § 9-102 to automatically extend to all voting-related functions (regardless whether the function is performed by the voting system) is that such an interpretation would cover the absentee ballot-delivery system as well. That system performs a ballot-presentation function, and arguably a ballot-definition function also, for all UOCAVA voters who choose to receive their ballots electronically, whether or not the ballot wizard is used to facilitate use of the ballot-delivery system. Accordingly, if it were true that any technology that carries out a covered function requires State certification, as some have proposed, it follows that the online ballot-delivery system would be subject to that process too. We are unaware of any state having adopted so expansive an interpretation of its certification requirements, and we do not believe Maryland law commands

this result either. For these reasons, we do not think the commenters' proposed reading of § 9-102 best reflects the language or structure of the statute.

With respect to commenters' concern about the protection of the voting system, the full certification regime prescribed in § 9-102, including testing under the EAC program, is designed to provide assurance about the security and reliability of the entire voting system and is, presumably, appropriately thorough to suit that purpose. Because even small modifications to the voting system have the potential to affect the system in unknown ways, re-testing and re-certification are also necessary following virtually any change to the system or a system component by the vendor. But where a device with no interaction or potential to affect the voting system is proposed, we believe a court would likely defer to the State Board's interpretation of § 9-102 to not demand the same re-certification process.[18]

The conclusion that the process outlined in § 9-102 is not mandated for the ballot wizard does not mean that no evaluation or testing is necessary; even in the absence of certification, the State Board may not act unreasonably in implementing the technology. *See*, *e.g.*, *Fritszche v. Maryland State Bd. of Elections*, 397 Md. 331, 341 (2007) (agency action must be supported by facts, within the scope of delegated authority, and not arbitrary, capricious, or unreasonable). The State Board must make the determination to move forward with the ballot wizard upon the basis of substantial evidence—evidence, we understand, that SBE is currently compiling through an ongoing testing process. SBE must also ensure that "security and integrity are maintained in the casting of ballots, canvass of votes, and reporting of election results," EL § 1-201(6), and that each ballot is "easily understandable," "present[s] all candidates and questions in a fair and non-discriminatory manner," "permit[s] the voter to easily record a vote on questions and on the voter's choices among candidates," "protect[s] the secrecy of each voter's choices," and "facilitate[s] the accurate tabulation of the choices of the voters." EL § 9-203. These statutory standards continue to apply in the absence of certification, with the State Board delegated the authority to determine, in the exercise of its

---

[18] Notably, the circumstances under which SBE may decertify a previously certified voting system do not include the loss of federal certification. *See* EL § 9-103(a)(2) (requiring de-certification "if the State Board determines that the system no longer merits certification" or the voting system will no longer, as required by § 9-102(d)(1)(i) through (iii), protect the "secrecy of the ballot" or the "security of the voting process," or will no longer "count and record all votes accurately").

reasonable judgment, the form and extent of testing necessary to meet those standards.

It is important in this respect to acknowledge that State and federal law both include special provision for UOCAVA voters in light of the unique challenges these voters face. A known problem for all absentee voters, as compared to voters who are able to cast ballots in polling places, is a higher rate of "residual votes"—*i.e.*, the total number of votes that cannot be counted for a specific contest, whether because of overvoting, undervoting, or failure to properly record the voter's intent. *See* Voluntary Voting System Guidelines, Appendix A: Glossary, at A-16, *available at* http://www.nist.gov/itl/vote/upload/VVSG-Volume-IAppendixA.pdf (last visited Aug. 16, 2012). SBE's ballot wizard is meant to address this problem by preventing overvotes and undervotes and by reducing the incidence of errors during the ballot-duplication process. Thus, provided SBE acts reasonably in testing the ballot wizard and deciding whether it is safe to deploy, making that tool available to UOCAVA voters appears to us to be consistent with the statute and legislative intent. Given SBE's statutory duty to "maximize the use of technology in election administration," EL § 2-102(b)(7), and the goal of the Election Article to emphasize "citizen convenience," EL § 1-201(5), we believe that the better interpretation of § 9-102 is not one that effectively precludes the use of a tool that could improve the accuracy with which absentee votes are counted.

## III

### Conclusion

In summary, it is our opinion that, in the absence of governing case authority, the State Board may reasonably conclude that the ballot-marking wizard it proposes for UOCAVA voters does not itself constitute, or modify, a "voting system" such that it is subject to the certification requirements of § 9-102 of the Election Law Article.

Douglas F. Gansler
*Attorney General*

Adam D. Snyder*
*Chief Counsel*
*Opinions & Advice*

* Jeffrey L. Darsie contributed significantly to the preparation of this opinion.

*Editor's Note*:

Since the issuance of this Opinion, the California State Legislature passed Assembly Bill 1929, which is discussed on

pages 44 and 45 of this Opinion. Governor Brown signed the measure into law on September 28, 2012, and it was "chaptered" by the Secretary of State as Chapter 694, Statutes of 2012.